2026 IL App (2d) 260031-U
No. 2-26-0031
Order filed May 7, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

DARVIONTE D. FULTZ, Defendant-Appellant.

Appeal from the Circuit Court of De Kalb County.
Honorable Marcy L. Buick, Judge, Presiding.
No. 25-CF-294

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justice Schostok concurred in the judgment.
Justice Jorgensen dissented.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying defendant pretrial release where there was clear and convincing evidence that (1) defendant posed a real and present threat to the minor victim, the victim's family, and the community where defendant and his wife approached the victim and his family in a confrontational manner while armed with a firearm, got into a physical altercation, and defendant shot the victim; and (2) conditions could not mitigate the threat posed by defendant where there was ongoing conflict between the victim's family and defendant's wife.

¶ 2    Defendant, Darvionte D. Fultz, appeals from the denial of his pretrial release under section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1 (West 2024)). For the following reasons we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On May 29, 2025, defendant was initially charged via complaint with aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2024)) and aggravated unlawful possession of a weapon (no concealed carry license) (*id.* § 24-1.6(a)(3)(a-5).  The charges arise out of an incident which occurred on May 28, 2025, in which defendant and his wife, Akiah D. Washington, got into a physical altercation with J.M.J, the minor victim; Sharneshia Hunt, who was J.M.J.'s mother; Lano Miller; and another woman, ultimately leading to defendant shooting J.M.J. in the abdomen.

¶ 5    On May 29, 2025, the State filed a verified petition to deny pretrial release pursuant to section 110-6.1 of the Code. A hearing was held on the State's petition the same day, following which the trial court granted the State's petition to deny pretrial release.

¶ 6    At the pretrial detention hearing, the State asked the court to take judicial notice of the police synopsis. According to the police synopsis, officers responded to a report of a shooting in the 800 block of Russell Road in De Kalb. Officers located a 17-year-old victim, J.M.J., with a gunshot wound to his abdomen. J.M.J. was transported to the hospital for surgery. Police spoke with a witness who observed defendant and his wife Washington arguing with individuals in the street outside of an apartment building located at 822 Russell Road. The witness saw defendant with a firearm, heard a single gunshot, and then observed defendant and Washington go back into the apartment building. The witness knew defendant and Washington to stay in apartment nine.

¶ 7    Officers reviewed surveillance footage from a TransDev bus which captured the incident. According to the synopsis, the footage showed defendant and Washington engaged in a fight with J.M.J. and other individuals. During the fight, defendant was engaged with J.M.J. when he fired a single shot striking J.M.J. and causing him to fall. Defendant and Washington then walked towards the apartment building.

¶ 8 Officers went to apartment 9 and made contact with defendant and Washington, who were taken to the De Kalb Police Department for questioning. Defendant stated that he and Washington were "jumped" by several individuals and a fight ensued. He continued that, during the fight, defendant and J.M.J. struggled over defendant's firearm and he discharged the firearm during the struggle.

¶ 9 A search of the apartment was conducted and a Taurus G2C 933 firearm was recovered. A LEADS search revealed that defendant possessed a valid FOID card but did not possess a valid concealed carry license.

¶ 10 The State acknowledged that defendant did not have a criminal history, history of substance abuse, or any known mental health issues. The State maintained that despite defendant's clean history, defendant's actions constituted extremely violent and dangerous behavior directed towards a minor. Further, defendant discharged his firearm in an area with several people around, endangering the public in general. The State further argued that no set of conditions could mitigate the threat posed by defendant.

¶ 11 Defendant argued that pretrial release was appropriate, maintaining that there was a reasonable inference of self-defense or an inadvertent discharge. Defendant also argued that he had no criminal history and scored a one on the Virginia Pretrial Risk Assessment. Additionally, conditions of pretrial release were available to mitigate the threat posed by defendant such as electronic home monitoring, a no-contact order, and relinquishing any firearms to the police.

¶ 12 The trial court denied defendant's pretrial release, noting that the shooting and altercation occurred in broad daylight near a public park, and that defendant apparently made no attempt to render aid to the victim or call an ambulance.

¶ 13    On August 12, 2025, defendant filed a motion to reconsider pretrial detention, which argued that defendant should be granted pretrial release because Washington had suffered a miscarriage, was on bed-rest, and defendant was needed to care for her and their ten-year-old child. Defendant also would no longer be living near J.M.J. and his family. Finally, a statement from the bus driver and the surveillance footage showed that J.M.J. and the other individuals initiated the confrontation. A hearing was held on August 13, 2025. At the hearing defense counsel proffered that Washington had previously sought a protective order against Hunt, who was one of the individuals who engaged in the altercation with Washington. However, her petition was dismissed due to a procedural defect. Hunt was now seeking a protective order against Washington, and Washington claimed that Hunt told her she would "get her ass kicked" if she showed up to contest the protective order. The trial court denied defendant's motion to reconsider.

¶ 14    On December 17, 2025, defendant filed a motion for relief from judgment. A hearing was held on January 7, 2026. At the hearing defense counsel proffered that Washington had obtained an order of protection against Hunt. Additionally, there were pending criminal charges against Hunt and Miller for violating that order of protection. Defense counsel further proffered that the bus driver had seen J.M.J., Hunt, Miller, and the other woman waiting in the same location about half an hour earlier on her previous round. Defense counsel also argued that the surveillance video showed Hunt with a taser. Additionally, video existed from a prior incident where Hunt was outside of the apartment building waiving a hatchet around screaming, "get my fucking gun." The bus surveillance footage was also tendered as evidence.

¶ 15    The bus surveillance footage from the instant case showed the bus turning South onto Russell Road. The bus came to a stop in front of 822 Russell Road. As the bus approached J.M.J. and Miller were standing in the middle of the street facing south. To their right, on the west side

of the street, Hunt, another woman, and a child were getting out of a black sedan. Hunt appeared to have a small item in her right hand, but there is nothing to indicate that it was a taser, and she did not brandish the item as if it were a weapon. Defendant and Washington approached the group from the south. Defendant had his right hand near his waistband. Defendant stepped up to J.M.J. and Miller, while Hunt and the other woman stepped up to Washington.

¶ 16    They all appeared to be arguing. Miller made a bluff charge towards defendant, and defendant then charged him. As he did, J.M.J. either punched or pushed defendant. Defendant then reached into his waistband. As this was happening the unidentified woman began to step towards the group of men. As she did, Washington began striking Hunt. The two melees then merged. Defendant lunged towards Miller attempting to punch him, as Miller backpedaled away from the group. J.M.J. then interposed himself between Washington and the two women, causing Washington to back away. J.M.J. then left the group of women to engage with defendant, as Miller stepped forward to push Washington. Seeing this, defendant charged Miller who backpedaled away from the melee. J.M.J. pursued defendant throwing punches as defendant's back was turned. Defendant then turned and fired his gun at J.M.J., who fell to the ground. Miller then fled the field as the women were engaged in grappling.

¶ 17    Defendant briefly pursued Miller, pointing his gun, before turning back towards the group of women. He appeared to place the gun back in his waistband. At this point Washington was on the ground holding Hunt down. As this happened, J.M.J. struggled to get back to his feet and proceeded to hop away eastward. Defendant managed to break up the fight between the women. Washington then headed east towards the apartment building's southern parking lot, while defendant retrieved what appeared to be a backpack and a jacket. Defendant then headed towards the building's southern parking lot. Hunt and the other woman went back to the car and then east

towards where J.M.J. and Miller had gone. Approximately two minutes later police arrived at the scene.

¶ 18    The trial court took the matter under advisement and denied defendant's motion on January 15, 2026. Defendant timely appealed.

¶ 19                                    II. ANALYSIS

¶ 20    On appeal, defendant argues that the State did not prove by clear and convincing evidence that (1) defendant posed a real and present threat to the safety of any person or persons or the community based on the specific articulable facts of the case, arguing that the trial court relied exclusively on the nature of the charges; (2) the State did not prove by clear and convincing evidence that no condition or combination of conditions could mitigate the threat posed by defendant as his pretrial risk assessment indicated a low likelihood that he would be charged with a new offense if released, and defendant's actions were taken in self-defense under circumstances which were unlikely to reoccur; and (3) the trial court erred when it denied defendant's motion to reconsider based on the admission of new evidence "establishing that J.M.J. and others were the aggressors, and that defendant needed to be released in order to care for his Washington and their child."

¶ 21    All defendants shall be presumed eligible for pretrial release, and the State shall bear the burden of proving otherwise by clear and convincing evidence. 725 ILCS 5/110-6.1(e) (West 2024). To deny a defendant pretrial release, the State must show that (1) the proof is evident or the presumption great that the defendant has committed an eligible offense, and (2) the defendant poses a real and present threat to the safety of any person or persons or the community, which (3) no condition or combination of conditions can mitigate. *Id.* The trial court's finding that no

combination of conditions can mitigate the threat posed by a defendant must be based on the specific articulable facts of the case. *Id.* § 110-6.1(e)(3).

¶ 22 Regarding dangerousness, despite the results of defendant's pretrial risk assessment and clean criminal history, there was clear and convincing evidence that defendant posed a real and present threat to the safety of J.M.J., J.M.J.'s family, and the community. Regarding the nature and circumstances of the charged offense, this case involved a crime of violence and the use of a firearm. *Id.* § 110-6.1(g)(1), (7). Additionally, while defendant seeks to characterize his actions as self-defense and paint J.M.J. and the others as the initial aggressors, the evidence presented does not bear this out.

¶ 23 Even accepting defendant's proffer that the bus driver saw J.M.J. and the others waiting at the same location an hour earlier, at this time, there is no other evidence suggesting that they were specifically waiting for defendant or Washington. The evidence we do have shows that defendant and Washington approached J.M.J.'s group in a confrontational manner while defendant was armed with a concealed firearm without a concealed carry permit. Defendant and Washington's access to their apartment was not blocked. Additionally, defendant and Washington had set down the things they had been carrying in order to go and confront J.M.J.'s group, indicating that they were initiating (or at least anticipating) the physical confrontation. Defendant's failure to call for emergency assistance does not bolster his accusations.

¶ 24 Moreover, defendant discharged his firearm in a roadway surrounded by an occupied apartment building on one side and a park on the other. A bus with passengers was in the street and a young child was with J.M.J.'s group. Even if we accept that J.M.J.'s group was waiting to confront defendant and Washington, instead of going back to his apartment and calling the police,

defendant chose to confront the group while armed illegally, thereby placing everyone in the vicinity in danger.

¶ 25    While defendant argues that his actions were taken in self-defense, "the question of whether a defendant's use of force was *ultimately* justified is a matter resolved at *trial*[.] (Emphasis in original.)" *People v. Smith*, 2024 IL App (2d) 240168, ¶ 21. Despite the surveillance footage and defendant's proffer, questions of fact still exist such as whether defendant was an initial aggressor, and whether the force used was justified. At a hearing on pretrial detention, the court is not required to accept a defendant's claim of self-defense where the record permits other conclusions concerning the defendant's culpability and, by extension, potential dangerousness. *People v. Romine*, 2024 IL App (4th) 240321, ¶ 21.

¶ 26    Further, defendant's proffer regarding the ongoing conflict between Hunt and Washington indicates a heightened risk of additional conflict between defendant and J.M.J.'s family if defendant were released.

¶ 27    Accordingly, there was clear and convincing evidence that defendant posed a real and present threat to the safety of J.M.J., his family, and the community.

¶ 28    Turning to conditions of pretrial release, defendant argues that the trial court failed to consider the plethora of available pretrial release conditions, and that because defendant was acting in self-defense when he shot J.M.J., a similar incident was not likely to occur. We reject this contention. From the record, the conflict between J.M.J.'s family and defendant's family was ongoing with both sides seeking orders of protection and Hunt being charged with violating an order of protection obtained by Washington. While this may tend to support defendant's self-defense argument, it also indicates a heightened likelihood of future conflict between defendant and the victim's family.

¶ 29 Further, despite defendant's lack of criminal history, defendant's choice to carry a gun in public without a concealed carry permit indicates a willingness to disregard pretrial release conditions. See *People v. Rose-Watkins*, 2026 IL App (1st) 252509-U, ¶ 43 ("[I]llegally possessing a firearm *** supports a finding that [the defendant] is willing to disregard conditions of pretrial release and accordingly supports his pretrial detention.")

¶ 30 Finally, we address defendant's contention that his release is required in order to help care for Washington and their children. Washington was pregnant at the time of the shooting and defendant presumably was already helping to care for her and their child. This did not prevent him from getting into a physical altercation with J.M.J. and shooting him in Washington's immediate presence.

¶ 31 Accordingly, we find that there is clear and convincing evidence that no condition or combination of conditions can mitigate the threat posed by defendant.

¶ 32                                    III. CONCLUSION

¶ 33 For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 34 Affirmed.

¶ 35 JUSTICE JORGENSEN, dissenting:

¶ 36 The majority today upholds a pretrial detention order where the State failed to proffer any specific articulable facts, apart from the elements of the crime itself, that prove by clear and convincing evidence that there are no conditions of release that could mitigate defendant's safety risk. I depart from the majority's dangerousness finding; however, even assuming, *arguendo*, the State established dangerousness, I would find there were conditions of release that would mitigate any potential safety threat posed by defendant. I, therefore, respectfully dissent.

¶ 37    Under the Code, as amended, the State has the burden to prove by clear and convincing evidence that: the proof is evident or the presumption great that the defendant has committed a detainable offense (*id.* § 110-6.1(e)(1)), the defendant's pretrial release poses a real and present threat to the safety of any person or the community (*id.* §§ 110-6.1(a)(1)-(7), (e)(2)), and less restrictive conditions would not mitigate the real and present threat to the safety of any person or the community (*id.* § 110-6.1(e)). "Evidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 74.

¶ 38    Section 110-10(a), (b) of the Code, as amended, authorizes the circuit court to impose a nonexhaustive list of pretrial release conditions that may mitigate an individual or communitywide safety concern and mitigate the risk of future violations. Importantly, those conditions include that a defendant (1) "surrender all firearms in his or her possession to a law enforcement officer designated by the court to take custody of and impound the firearms and physically surrender his or her Firearm Owner's Identification Card to the clerk of the circuit court ***"; (2) "[r]efrain from possessing a firearm or other dangerous weapon"; (3) "[r]efrain from approaching or communicating with particular persons or classes of persons"; (4) "[r]efrain from going to certain described geographic areas or premises"; (5) "[b]e placed under direct supervision of the Pretrial Services Agency, Probation Department or Court Services Department in a pretrial home supervision capacity with or without the use of an approved electronic monitoring device"; and (6) any other reasonable conditions, so long as these conditions are the least restrictive means to "ensure the defendant does not commit any criminal offense, ensure the defendant complies with all conditions of pretrial release, prevent the defendant's unlawful interference with the orderly administration of justice, or ensure compliance with the rules and procedures of problem solving

courts," are individualized, and follow national best practices detailed in the Pretrial Supervision Standards of the supreme court. 725 ILCS 5/110-10(a)(5), (b)(3)-(5) (West 2024).

¶ 39    Although I disagree with the majority's dangerousness analysis, for the sake of argument, I assume the State proved that defendant was dangerous. Nonetheless, it is essential to consider defendant's degree of dangerousness, to properly consider whether appropriate conditions exist that would mitigate any safety concern. See *People v. Romine*, 2024 IL App (4th) 240321, ¶ 16 (finding "dangerousness and conditions of release are two sides of the same coin; the nature and severity of the threat necessarily determine the nature and severity of the conditions that could— or could not—mitigate the threat."). During the detention proceedings, the evidence, including a video recording from a bus, showed that defendant and his pregnant girlfriend, Washington, walked towards a group of individuals already congregating on the street. There were four individuals outside a car also moving toward defendant and Washington. Defense counsel recounted (and it was not disputed by the State) a bus driver's statement, indicating that the individuals exiting the car, Hunt, Miller, and J.M.J. among them, had been standing, blocking the street, at the same location 30 minutes prior to the shooting. While the video showed defendant walking towards Hunt's car, defense counsel also proffered that the bus driver believed defendant approached and said, "What's going on?" It is after that, the fight broke out; defendant and Washington were outnumbered. The bus surveillance video depicts that J.M.J and Miller were marginally taller than defendant and Washington, but with a slimmer build. Based on defendant's proffers and pretrial arguments, he has raised a viable claim for self-defense or the defense of his pregnant girlfriend, which is relevant, although not conclusive, during pretrial proceedings. *People v. Smith*, 2024 IL App (2d) 240168, ¶ 21.

¶ 40    The majority further supports dangerousness and faults defendant for not retreating to his

- 11 -

abode, for discarding items as he approached Hunt and the others, and for not calling emergency assistance after the shooting. I do not view this evidence in the same light. Regarding defendant's opportunity to retreat, the parties' proffers evince that defendant did *not* appear to approach in a confrontational manner, as he approached and asked what was going on, according to the account from the bus driver. As such, there was no apparent reason for defendant to retreat, as he was not the confronter. Next, while the video shows Washington discarding her shoes as she approached Hunt, the video does not show when or if defendant discarded a backpack he later retrieved. Any hypothesis as to when or why the items were discarded is rank speculation. Finally, defendant's failure to call emergency services, in my view, *supports* his claim for self-defense, *not diminishes it*. I believe it is far more reasonable to conclude that someone in imminent danger, or protecting a loved one from imminent danger, is more likely to flee danger and assist a loved one in fleeing, before calling 911. This is especially true here where defendant likely did not realize the extent of J.M.J.'s injuries, as defendant turned his back on J.M.J. after firing, to briefly follow Miller. During these few seconds, J.M.J. rolled to the curb and jumped away. Defendant's failure to incapacitate J.M.J. was all the more reason to flee rather than stop to call emergency services. Thus, in my view, failing to call emergency services here is not indicative of dangerousness.

¶ 41    Finally, I do not agree with the majority's supposition that there is a heightened risk of additional conflict between defendant and J.M.J.'s family. The evidence shows that defendant and Washington no longer live in proximity to J.M.J. and his family. Further, Washington sought and obtained an order of protection against Hunt and Miller, and both Hunt and Miller have since been charged with violating this order. Overall, there is no indication that defendant is at risk of initiating or participating in future conflict with J.M.J.'s family. On the contrary, the presented evidence indicates that it is defendant and Washington who have taken steps to diminish any potential for

future communication with J.M.J. or his family by moving out of the area.

¶ 42    However, assuming defendant is dangerous, I find the State failed to present clear and convincing evidence that there were no less restrictive conditions than detention that would mitigate the real and present threat defendant posed to the safety of J.M.J. or the community. The State's only argument was that "based on the specific and articulable facts of the case—namely, bringing a gun in public and discharging it in public—that there is no set of circumstances that could allow this defendant to be safely released from the custody of DeKalb County jail ***." I disagree and submit any number of conditions would mitigate defendant's safety risk.

¶ 43    Defendant's possession and discharge of a gun in public alone is not clear and convincing evidence that no conditions exist, less than detention, that would mitigate his safety risk to J.M.J. and the community. While the nature of the charge is one factor to consider in determining whether conditions can mitigate dangerousness, here, possession of a weapon and discharge a weapon in public are essential elements of the detainable offenses. This evidence alone is not sufficient to justify defendant's detention, as section 110-5 requires that courts base their findings of detention on more than the general nature of the charge itself. 725 ILCS 5/110-5(a) (West 2024); *People v. Stock*, 2023 IL App (1st) 231753, ¶ 18 (finding that "[i]f the base allegations that make up the *sine qua non* of a violent offense were sufficient on their own to establish this element [(conditions of release)], then the legislature would have simply deemed those accused of violent offenses ineligible for release."); see also *People v. Bartosik*, 2026 IL App (4th) 251398-U (affirming the basis of *Stock* under *de novo* review).

¶ 44    Considering the remainder of the majority's analysis on conditions of release, I believe *de novo* review supports the imposition of conditions. Here, defendant has no prior criminal history, no history of substance abuse, and no history of mental illness. Defendant scored only one point

on his Virginia Pretrial Risk Assessment, suggesting that there was a 96% probability he would attend all future hearings and *not reoffend*. He was also recommended for release *without supervision*. These recommendations should carry significant weight in favor of release with conditions. Defendant also possessed a valid FOID card and had, thus, passed the rigors of scrutiny to legally own a firearm in Illinois. Although he did not possess a CCL, he had taken significant steps to comply with Illinois gun laws. There is no indication here that defendant armed himself to engage in a conflict. Rather, the evidence and defendant's proffer show that it was Hunt and her family who had been "waving in the street" 30 minutes prior to the altercation. The evidence also supports defendant's claim that he did not approach J.M.J. or his family in a confrontational manner. Instead, the evidence supports a viable claim of self-defense or defense of Washington. Overall, defendant's lack of criminal history, grant of a FOID license, and viable defense show he has the ability and willingness to comply with any and all conditions the court may set. The majority's analysis and suppositions leave more than a reasonable doubt in my mind that the State's evidence was sufficient to foreclose conditions of release. With this in mind, and the presumption being defendant's release (725 ILCS 5/110-6.1 (West 2024)), I would reverse the circuit court's detention order and remand this cause to the circuit court for the imposition of conditions consistent with the Code, as amended. 725 ILCS 5/110-5, 110-10 (West 2024).